**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2572-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

M.G.R.,[1]

     Defendant-Appellant.

_____

> Argued December 16, 2025 – Decided April 14, 2026
>
> Before Judges Susswein and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-11-1465.
>
> Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the brief).
>
> Nicole Handy, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington

---

[1] We use initials to protect the confidentiality of the record and the privacy interests of the parties. See R. 1:38-3(d)(10).

County Prosecutor, attorney; Nicole Handy, of counsel and on the brief).

PER CURIAM

Following a bench trial, the court convicted defendant M.G.R. of murdering her mother, D.D., and related weapons offenses, having rejected defendant's insanity defense. Defendant contends that her convictions should be reversed for three reasons: (1) the trial court erred in admitting her statement to the police without expert testimony; (2) the prosecutor's improper comment in summation undermined defendant's right to remain silent and deprived her of a fair trial; and (3) the trial court failed to find the required mental states for the charged offenses. Having reviewed the record and applicable law, we affirm defendant's convictions.

I.

We summarize the pertinent facts and procedural history from the trial record. On the morning of September 6, 2019, when D.D. did not log into her computer for work as expected and did not respond to phone calls or texts from co-workers, her manager and friend, L.L., drove to her home for a wellness check. When D.D. did not answer the door, L.L. contacted 9-1-1.

Police responded, entered D.D.'s apartment, and found her dead on the bathroom floor. D.D. had suffered multiple stab wounds and there was blood

2

throughout the apartment. The living room television was blaring loudly. A knife and blood-stained rag were found in the kitchen sink and other bloody clothing items, later identified as belonging to defendant, were found in the apartment.

Officers contacted D.D.'s former spouse and defendant's father, E.R., and then began searching area hotels for defendant. Later in the evening on September 6, defendant was located in a nearby hotel and brought to the local police station.

Detective Nicholas Villano and Sergeant Thomas Corsanico interviewed defendant. Before speaking with her, defendant's father advised Corsanico that she had a history of mental illness and a prior hospitalization. Initially, the detectives engaged in a general conversation with defendant, asking preliminary questions such as "her name, date of birth, childhood, and education and employment history." According to Corsanico, defendant responded appropriately and "seemed lucid and gave coherent answers."

Villano then read defendant her Miranda[2] rights and she signed the Miranda card. After being advised of her rights, defendant initially stated she did not want to speak with the officers, so they left the room. Upon their return,

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2572-23

defendant stated that she changed her mind and was willing to speak with them. Defendant continued to change her mind multiple times about speaking with them. The officers again left the room. As the officers re-entered the room, defendant spontaneously stated she was "ready to talk with them" if they still wanted to talk with her. Villano advised defendant he would need to reread "that card" to her, to which she agreed. He then readvised defendant of her <u>Miranda</u> rights, she initialed a second <u>Miranda</u> card, acknowledging again that she understood each of her rights.

During the interrogation, defendant was able to recall some information but repeatedly responded that she could not recall or did not know the answer to the officers' more specific questions. She also claimed to be confused at times during the questioning. In response to a question regarding her medication, she explained that she had been off her medication "for a while." Defendant's hands had visible cuts on them for which she sought medical treatment at a nearby hospital before she was detained. She told hospital staff that she was injured by a sprinkler. During the interview, when asked about the explanation she had given, defendant stated she "didn't know what happened" to her hands so she "made something up." Defendant was asked to consider what her mother would say if she were present, and she responded: "If it was me, I can't forgive myself.

A-2572-23

It was me, wasn't it?" As the officers pressed her to piece together what happened involving her mother, she said she did not want to talk anymore and the interrogation ended.

In November 2019, defendant was charged by indictment with murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). In December 2019, defendant was evaluated for competency. Beginning in June 2020, defendant had resided at the Ann Klein Forensic Center where she was evaluated, treated, and participated in "competency restoration programming." Defendant was later deemed competent to stand trial.

Defendant waived her right to a jury trial. Prior to trial, defendant moved to suppress the statement she gave to police at the stationhouse on September 6, 2019. On October 11, 2023, the suppression hearing was held; Detective Villano testified on behalf of the State, and the video recording of defendant's interview was admitted into evidence.

Finding Detective Villano credible, the trial court concluded defendant was properly advised of her Miranda rights prior to the interview and that she "acknowledged her rights verbally and in writing." The court found:

[D]efendant's waiver was knowing, intelligent, and voluntary in light of the other circumstances. Defendant's waiver was not compromised by defendant not taking her medication. Defendant demonstrated sufficient clarity of mind to effectively communicate, understand, and make decisions about whether to be intervened by police or remain silent. Moreover, she was fully able to participate in the interview. Her answers, when she could recall, were logical and responsive to the questions asked. She expressed no issues with any of the interviewing officer's questions, nor did she experience any difficulty understanding or responding to the officers' questions.

Concluding that defendant's statement was "voluntary" and not the "product of coercion or official misconduct," the court denied defendant's motion to suppress.

A five-day bench trial began on October 12 and concluded on November 1, 2023. Defendant did not contest that she had killed her mother. Rather, asserting an insanity defense, defendant contended she did not understand the nature and quality of her actions. Defendant argued that the most significant evidence was the psychiatric records from her 2018 psychiatric hospitalization in Maine.

In June 2018, defendant disappeared for a month but was later found admitted to a hospital in Maine. She called herself "Cat Zill," provided a false

6

date of birth and claimed she could not recall how she got there. During this episode she "complained of insect bites, but no such bites were found."

Defendant was admitted to a nearby psychiatric hospital. Her medical records indicated that "she suffered from a psychotic episode, was 'extremely disorganized and confused,' and could not remember what happened before hospitalization." Her condition reportedly improved with medication, and she subsequently moved into her mother's apartment in Mount Laurel two weeks after she was discharged, where she remained until the present incident.

After returning to New Jersey, defendant began receiving treatment from Dr. Edward Baruch. According to Dr. Baruch, defendant "suffers from a long history of schizophrenia," with "aspects of paranoia and disorganization." Two days before her death, D.D. called Dr. Baruch to report that defendant had stopped taking her medication and was "off the walls." "Dr. Baruch advised D.D. to contact law enforcement if defendant were a danger to herself or others." However, D.D. believed defendant would "be ok [un]til Monday."

Defendant's father testified on her behalf and stated that he and D.D. had confronted defendant on at least two occasions about not taking her medication. He explained that when defendant took her medication, she was "okay" and

"could have normal conversations." However, when she did not take her medication, defendant's father described her as "off" and "incoherent."

D.D.'s neighbors testified that in the early morning hours of September 6, they woke up to "a young girl yelling" and "lots of noises" for several minutes. One of the neighbors testified he heard "banging, but not as loud, and like muffled, like incoherent mumbling by []a very raspy female voice."

Detective Timothy Horne testified that during the investigation he learned of a text message from TD Bank's fraud department on D.D.'s phone inquiring if she attempted a $200 withdrawal at 4:57 a.m. on September 6. Horne confirmed that one of the bank cards later found in defendant's hotel room was a TD bank card in her mother's name.

Sometime between 4:30 a.m. and 5:00 a.m. on September 6, defendant entered a nearby hotel requesting a room. According to the hotel employee, she provided her driver's license, cash for payment, and her own credit card for incidentals. When that card was declined, defendant used D.D.'s credit card, telling the employee it was her mother's and she had permission to use it.

Hotel staff testified regarding their interaction with defendant that early morning. Shortly after her arrival, defendant asked the night receptionist for band aids because she "cut her hand . . . with her knife." The receptionist gave

8

defendant a few bandages for her hands, but suggested she go to a hospital for treatment because the cuts appeared "very deep."

The night receptionist testified that, although he did not notice anything concerning about defendant's behavior, he let the day receptionist know that defendant had checked in and seemed a bit "sketchy," and to "be on the lookout for her." The day receptionist testified that later that morning, defendant asked for more bandages and a room change because her room was "dirty." Like her colleague, the day receptionist did not notice anything concerning about defendant's behavior; she testified, however, that defendant seemed "startled" and "looked a little [] paranoid."

At trial, it was established that the tread pattern of the blood-stained shoe prints on the bathroom floor next to D.D.'s body matched the treads of defendant's shoes worn at the time she was detained and interrogated. During police questioning, defendant confirmed she had been wearing those same shoes while at home that day. Moreover, testing established that defendant's DNA matched the DNA profile taken from the knife located in the apartment's kitchen sink and the blood stain inside D.D.'s purse found in her bedroom.

Two forensic psychologists testified as experts: the defense called Dr. Peter Oropeza and Dr. Elliot Atkins testified on behalf of the State as a rebuttal

expert. These experts evaluated defendant's mental state at the time of the alleged offenses and agreed that defendant "qualifies for a diagnosis of schizophrenia." Neither expert, however, evaluated defendant's competency to waive her <u>Miranda</u> rights.

In his supplemental report, Dr. Oropeza concluded to a reasonable degree of psychological certainty that:

> . . . as a result of active symptoms of schizophrenia at the time of the offense[s] . . . she was not aware of her behavior, did not knowingly engage in reality based behavior, and was significantly impaired on the day in question such that she was laboring under such a disease of defect from reason of the mind so as not to know the nature or quality of what she was doing . . . and specifically, it was my opinion that she met the criteria for insanity.

In his professional opinion, he explained that defendant "was suffering from significant symptoms of . . . []schizophrenia[] rendering her to be laboring under such a defective reason from disease of the mind as to not know the nature and quality of the act she was doing."

Dr. Oropeza testified that defendant's symptoms were worsening in the weeks leading up to the offense. Specifically, he noted that defendant was not taking her medication, was experiencing paranoid delusions, and was experiencing amnesia about the violent episode with the pillow two weeks prior.

10

While acknowledging that defendant was able to engage in "some goal directed behavior," such as packing a bag, taking D.D.'s credit card, withdrawing cash from an ATM, and checking into a hotel after D.D.'s death, Dr. Oropeza emphasized that organized behavior does not necessarily equate with an individual, suffering from schizophrenia, appreciating the nature or wrongness of her actions.

Although he did not evaluate defendant's competency to waive her Miranda rights, Dr. Oropeza viewed and commented briefly on defendant's video recorded interrogation. In his initial report, he noted:

> Officers questioned [defendant] in a lengthy interview (note that [defendant] was hesitant to waive Miranda rights and be interviewed but ultimately agreed). [Defendant's] affect was flat, she exhibited poor memory recall and eventually discontinued the interview.

According to Dr. Oropeza, the other "notable" observation regarding defendant's interview was that defendant was "able to respond to a number of questions," and then at other times, "she can't recall or has no memory" of certain things.

Dr. Atkins, the State's rebuttal expert, agreed with the majority of Dr. Oropeza's findings, however, disagreed with his conclusion. Dr. Atkin concurred that defendant was suffering from schizophrenia and that her behavior was "significantly impaired by her mental illness." Specifically, Dr. Atkin disagreed

11

that defendant "would have met the requirements for . . . an [insanity] defense." He explained:

> Any opinion regarding a defendant's appreciation of the nature and quality (or the wrongfulness) of their actions would require an understanding of that defendant's perceptions and beliefs at the time of the offense. As [defendant] was amnestic regarding what took place immediately prior to, during, and subsequent to, the instant offense, we are not in the position to form an opinion regarding her knowledge or awareness of the nature and quality of the act that she was doing.

He testified that because "[w]e don't have any [] information as to what was taking place at the time of the commission of the offense, we cannot render an opinion [to a reasonable degree of psychological certainty] about her state of mind at that time." Because defendant could not remember the incident itself, "what she was thinking at the time [she] committed the crime," this lack of information as to her cognitive process resulted in Dr. Atkin concluding that "we are not in a position to offer an opinion within a reasonable degree of psychological certainty as to whether she knew what she was doing at the time or whether she knew that what she was doing was wrong."

Nonetheless, Dr. Atkins testified that defendant's behavior following the murder implied an awareness of the wrongfulness of her conduct. Specifically, he testified that defendant "knew what she was doing" after D.D.'s death

12

demonstrated by defendant packing a bag, taking D.D.'s credit card, withdrawing "money out of [an] ATM machine," and check[ing] into a hotel." According to Dr. Atkins, the "implication" was that defendant "recognized the wrongfulness of her behavior," because "[s]he was leaving the scene." He further explained that "very, very shortly after she committed the crime, she was acting in a way that was consistent with her knowing that what she had just done was wrong."

Dr. Atkins also reviewed defendant's video recorded stationhouse interrogation, although he did not evaluate her competency to waive her Miranda rights. He agreed with Dr. Oropeza that defendant's affect was flat and that "there were a lot of things [] she didn't remember." However, he found it "extremely clear that she was in touch with reality." He further explained that:

> [S]he knew what she was doing when she was responding to the interrogators' questions. In fact, she even knew what she was doing when she stopped the interrogation process when the questions started to become a little bit more aggressive. There was no indication whatsoever during that interrogation that she was actively psychotic. She still was schizophrenic, but it wasn't interfering with her ability to understand what she was doing.

Following the close of the evidence and summations, the trial court rendered a verdict, finding defendant guilty on all counts. Stating its reasons on

13

the record, it found all fact witnesses credible, but "afford[ed] less weight" to defendant's father's testimony because it was "colored by his care and concern for his daughter" and "his testimony on cross-examination testimony took on a different tone than on direct examination."

The trial court found that the State proved beyond a reasonable doubt that defendant caused D.D.'s death and that she did so purposely or knowingly. "The primary issue" before the trial court was "whether [] defendant ha[d] proven by preponderance of the evidence that [defendant] was insane at the time she committed these offenses." In other words, "at the time of committing the act, [was] defendant [] laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act, or if defendant did know it, that she did not know that what she . . . was doing was wrong[?]"

In evaluating the experts, the trial court found both witnesses credible but afforded greater weight to the testimony of Dr. Atkins. It stated:

> [Dr. Atkins] offered a more cogent, plausible and logical assessment of the evidence regarding defendant's mental state at the time of the offense, whereas Dr. Oropeza's assessment of defendant's mental state at the time of the offense is primarily based on inferences he drew from defendant's psychological history.

A-2572-23

The court found that "[w]hile defendant has proven that she suffered from a disease of the mind, there is insufficient direct or indirect evidence that at the time of the offense, that defendant did not know the nature and quality of her actions." Thus, the court determined "there [was] no preponderance of the evidence of insanity[,]" and found defendant guilty on all counts.

On March 8, 2024, the trial court sentenced defendant to thirty years for murder, with no parole eligibility, and concurrent terms of three years for possession of a weapon for an unlawful purpose and eighteen months for unlawful possession of a weapon." This appeal followed.

Defendant raises the following points for our consideration:

> POINT I
> [DEFENDANT'S] STATEMENT TO POLICE MUST BE SUPPRESSED BECAUSE, WITHOUT EXPERT TESTIMONY, THE STATE CANNOT MEETS ITS HEAVY BURDEN TO PROVE THAT [DEFENDANT] KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED HER MIRANDA RIGHTS BEYOND A REASONABLE DOUBT DESPITE HER SERIOUS MENTAL ILLNESS.

> POINT II
> THE PROSECUTOR'S IMPROPER ARGUMENT IN SUMMATION THAT [DEFENDANT'S] INSANITY DEFENSE WAS UNDERMINDED BY HER EXERCISING HER CONSTUTITIONAL RIGHT TO REMAIN SILENT DEPRIVED [DEFENDANT] OF HER RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT III
THE TRIAL COURT FAILED TO FIND THE REQUIRED MENTAL STATES FOR THE CHARGED OFFENSES.

## II.

### Motion to Suppress

We first consider defendant's argument that the trial court should have granted the motion to suppress her statements in the video recorded stationhouse interrogation because, without expert testimony, the State failed to meet its burden of proving beyond a reasonable doubt that defendant knowingly, voluntarily, and intelligently waived her <u>Miranda</u> rights. Defendant claims that because she was suffering from "unmedicated schizophrenia with a recent history of delusions, hallucinations, and amnesia," without expert testimony, the State did not meet its "heavy burden" of proving a valid <u>Miranda</u> waiver. Relying solely on lay opinions, defendant claims the State failed to prove, and the trial court erred in finding, that her "serious mental illness did not inhibit her ability to properly waive her [Miranda] rights beyond a reasonable doubt."

We defer to the factual findings of the trial court on a suppression motion when those findings are supported by sufficient credible evidence in the record. <u>State v. Sims</u>, 250 N.J. 189, 210 (2022); <u>State v. S.S.</u>, 229 N.J. 360, 379-80 (2017). We do so because they "are substantially influenced by [an] opportunity

to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy." State v. Reece, 222 N.J. 154, 166 (2015) (internal quotations omitted) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). We review legal conclusions drawn from the facts de novo. State v. Radel, 249 N.J. 469, 493 (2022); State v. Hubbard, 222 N.J. 249, 263 (2015).

"When a defendant moves to suppress custodial statements made to police, the State bears the burden of proving beyond a reasonable doubt that [] defendant's waiver of his [or her] Miranda rights was knowingly, intelligently, and voluntarily given the totality of the circumstances." State v. Erazo, 254 N.J. 277, 301 (2023) (citing State v. Hreha, 217 N.J. 368, 382-83 (2014)). In examining the totality of the circumstances, "the court considers all the facts surrounding the interrogation, including '[] defendant's age, education and intelligence, advice as to constitutional rights, length of [the] detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Ibid. (alteration in original) (citing State v. Nyhammer, 197 N.J. 383, 402 (2009) (quoting State v. Presha, 163 N.J. 304, 313 (2000))). These factors "are assessed 'qualitatively, not quantitatively.'" Hreha, 217 N.J. at 384.

A-2572-23

Defendant contends that her serious mental illness "posed a significant barrier" to proving that she properly waived her Miranda rights—a barrier which without expert testimony—the State could not and did not overcome.  We are not persuaded under the totality of these circumstances that the substantial, credible evidence, including defendant's video recorded police interview, establishes defendant's waiver was involuntary because her will was "overborne" and her "capacity for self-determination critically impaired" by her mental illness.  State v. Burney, 471 N.J. Super. 297, 315 (App. Div. 2022), rev'd on other grounds, 255 N.J. 1 (2023) (citing State v. P.Z., 152 N.J. 86, 113 (1997) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973))).

The totality of the circumstances analysis requires the court to consider all relevant factors and "qualitatively" evaluate those relative factors.  Cf. Presha, 163 N.J. at 323.  This inquiry encompasses "characteristics of [] defendant and the nature of the interrogation."  Hreha, 217 N.J. at 383 (quoting State v. Galloway, 133 N.J. 631, 654 (1993)).  Although "the presence of one [relevant] factor may permit the conclusion that a confession was involuntary," there is no per se rule under the totality of the circumstances analysis that a defendant's mental health issues will automatically negate the voluntariness of their Miranda waiver.  Ibid.; see State v. Smith, 307 N.J. Super. 1, 10 (App. Div.

1997) ("The fact that defendant was suffering from a mental illness at the time of the questioning did not render his waiver or his statement involuntary."); see also State v. Glover, 230 N.J. Super. 333, 342 (App. Div. 1988) ("[T]he record clearly demonstrate[d] that defendant's ability to make free and rational choices when interrogated by the police was not 'overborne by defendant's severe mental illness.'").

Defendant relies on our decision in Burney to support her contention that expert testimony was required concerning her mental state at the time she waived her Miranda rights. This reliance is misplaced.

In Burney, police located defendant in the Intensive Care Unit (ICU) "preparing to receive kidney dialysis." 471 N.J. Super. at 310. He was "connected to an intravenous line and an electrocardiogram" but had not begun dialysis at the time the officers arrived and began questioning him. Ibid. The officers verbally administered the Miranda warnings and did not obtain a written record or notation of defendant's waiver. Ibid. No audio or video recording of the interrogation was made. Ibid.

The trial court granted defendant's motion to suppress his hospital-bed statements, concluding the State failed to prove that he was properly advised of all his Miranda rights. Id. at 312. The trial court found that his statements could

19

A-2572-23

be used at trial for impeachment purposes should defendant testify because it concluded the statements were made voluntarily. Ibid. Defendant chose not to testify, however. We reversed the trial court's determination that the statements were voluntary because it did not "adequately consider all of the information in the record concerning defendant's medical condition." Id. at 316. For instance, a hospital report showed that defendant suffered from "shortness of breath . . . and [localized] right side chest pain," "[f]luid overload," "[a]nemia, electrolyte abnormality[,] and . . . toxic/metabolic derangement." Ibid. The trial judge candidly acknowledged that he did not have the benefit of an expert medical witness to explain the medical terms in the hospital report. Ibid. The judge stated:

> I'm not a medical doctor and I—I don't know—medical terminology, [and] very often, [it] means things very different than—than legal or layman terminology, so I don't place any strong emphasis on the word toxic . . . metabolic derangement. It could mean something very different from this.
>
> [Id. at 316-17.]

In the present case, unlike in Burney, the same concerns regarding defendant's medical condition were not present. Id. at 310-12. Defendant here was not hospitalized, not experiencing any medical crisis or acute symptoms of

her schizophrenia diagnosis, nor was she unaware of her circumstances and consequences of her decision to speak with law enforcement.

Moreover, the stationhouse interrogation was recorded, which the trial court had the opportunity to review. On the contrary, in Burney, the gurney-side interrogation was not recorded. Defendant answers were responsive to the officers' questions, and unlike while she was hospitalized in Maine in 2018, defendant provide accurate pedigree information to the officers. The evidence does not support the assertion that defendant's cognition was impaired or that her mental health issues "impacted [her] capacity for self-determination." Id. at 318. None of the same concerning facts found in Burney existed here.

Furthermore, defendant, twenty-three years of age, with several years of college experience, understood the officer's questions and the focus of their inquiry. The interrogation lasted approximately one and a half hours with breaks and water provided to defendant. She was read her Miranda rights twice and was provided the Miranda card to read and sign. She was advised she could end the interrogation at any time, and in fact, exercised that right.

We are satisfied that the trial court's finding defendant voluntarily waived her Miranda rights is based on consideration of the totality of the circumstances and supported by sufficient evidence in the record. State v. A.M., 237 N.J. 384,

398 (2019). As the court concluded, "[d]efendant's waiver was not compromised by [her] not taking her medication[,]" and she "demonstrated sufficient clarity of mind to effectively communicate, understand, and make decisions about whether to be interviewed by police or remain silent." Defendant's mental competence is a relevant consideration in determining voluntariness of her Miranda waiver; however, it is only one factor to be considered in the totality of the circumstances analysis.

The record is devoid of evidence that defendant's mental illness interfered with her decision to voluntarily waive her Miranda rights and speak with the officers. Without more, the State was under no obligation to present expert testimony regarding defendant's mental health and its potential impact on the voluntariness of her statement. We therefore affirm the court's denial of defendant's motion to suppress her statements during the interrogation.

III.

Prosecutor's Comment During Summation

We turn next to defendant's contention that the prosecutor's comment in summation concerning defendant's decision to exercise her right to remain silent undermined her insanity defense and deprived her of a fair trial. In summation, the prosecutor commented, "what does [defendant] do when [the officers] push

22

just a little bit harder, she doesn't want to talk about it any further[] . . . defendant had the wherewithal to exercise her right to terminate that interview."

Because no objection was made regarding this comment, we review it for plain error. State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001); R. 2:10-2. "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." State v. Butler, 263 N.J. 2, 22 (2026) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). Rather, an unjust result that warrants reversal must be "sufficient to raise a reasonable doubt as to whether the error led [the factfinder] to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Moreover, the error must be "evaluated 'in light of the overall strength of the State's case.'" Ibid.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). "[T]heir comments [should be] reasonably related to the scope of the evidence presented." Ibid. "[E]ven when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." State v. Williams, 244 N.J. 592, 608 (2021) (quoting

McNeil-Thomas, 238 N.J. 256, 275 (2005) (internal quotations omitted)). We "reverse a conviction on the basis of prosecutorial misconduct only if 'the conduct was so egregious as to deprive defendant of a fair trial," State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).

We begin by assessing whether the prosecutor's comment was improper. Defendant argues that the prosecutor's comment improperly undermined her right to remain silent by referring to her decision to terminate the police interrogation as evidence of her sanity. At the outset, we note that the defendant's "failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made . . . [and] deprive[d] the court of an opportunity to take curative action." Frost, 158 N.J. at 84.

Nonetheless, a prosecutor may not "suggest explicitly or implicitly that defendant's silence evidenced [her] sanity at the time of the homicide." State v. Oglesby, 122 N.J. 522, 535 (1991). "It is well-settled that the constitutional right against self-incrimination precludes the State from any trial tactic designed to suggest to the jury that defendant's guilt may be inferred from his [or her] silence." State v. Hyde, 292 N.J. Super. 159, 164 (App. Div. 1996). Such error, while significant, has not been deemed prejudicial per se. See Ibid. We do not

condone the prosecutor's remark because it ventured too closely to impermissibly commenting on defendant's invocation of the right to remain silent as proof of her sanity. However, we disagree that the prosecutor's comment here constitutes plain error warranting reversal of defendant's convictions.

Defendant relies on federal and state case law precedent in Wainwright v. Greenfield, 474 U.S. 284, 292 (1986); Oglesby, 122 N.J. at 534-35; and Hyde, 292 N.J. Super. at 166, to support her contention that the prosecutor's impermissible comment deprived her of a fair trial warranting reversal. In contrast to Wainwright, Oglesby, and Hyde, this was a bench trial. The potential for prejudice resulting from the prosecutor's comment in a bench trial is far less because a judge is aware of the restrictions on and improper use of such evidence. See New Jersey Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 576 (App. Div. 2010) ("A judge, trained and experienced in using evidence only for its purposes . . . is much less likely to be prejudiced against a defendant"). Further, a judge knows that the arguments of counsel are not evidence. See also State v. Di Frisco, 118 N.J. 253, 276 (1990) ("judges are presumed to know the law").

Moreover, in each of these cases, defendants invoked their right to remain silent immediately after being advised of their <u>Miranda</u> rights. In the present case, following the suppression hearing, the trial court determined that defendant knowingly, voluntarily, and intelligently waived her <u>Miranda</u> rights before making any statements to the police. And, only after being questioned for over an hour, did defendant revoke her waiver.

In addition to the video recording of defendant's interrogation, the State offered a video recording and other evidence of a variety of other actions defendant took after the murder but before the interrogation, such as withdrawing money from her mother's bank account at a local ATM and surveillance video from defendant's hotel check-in. Therefore, the State's comment regarding defendant's revocation of her willingness to speak to the officers must be considered in the context with other evidence offered to demonstrate defendant's awareness of her actions.

Defendant, while noting this was a bench trial, urges us to find plain error nonetheless because "the court's verdict reflect[ed] its consideration of this improper argument." We disagree. During its summary of the trial evidence and testimony, the court noted, "[w]hen pressed by Detective Villano about her mother's death, defendant informed officers that she no longer wanted to speak

with them."  The court made no further comment or drew any further conclusion from this fact.  The comment was fleeting and not repeated or emphasized further.

After considering "all the evidence," the court delineated its findings, and addressed "whether [] defendant ha[d] proven by a preponderance of the evidence that [she] was insane at the time she committed these offenses."  In addressing this issue, the court focused on the testimony of the two experts, Dr. Oropeza and Dr. Atkins.  The only other mention of defendant's exercise of her right to remain silent occurred when the court summarized, in part, Dr. Atkins' findings:

> Dr. Atkins highlighted the stringent requirements to meet the definition of insanity.  He noted how difficult it is to prove that a person did not know what they were doing. Dr. Atkins pointed out how defendant clearly knew what she was doing when she packed a bag and put her clothing in it and her passport in it, that defendant knew what she was doing when she put her PIN number in the ATM to withdraw money and that she knew what she was doing when she checked herself into the Wyndham Hotel and when she stopped the police interrogation when the questioning became more aggressive.[3]

---

[3]  Defendant did not object during Dr. Atkins testimony when asked on direct about the import of defendant's actions, including stopping the police interrogation when the questioning became more aggressive.

A-2572-23

The court found both doctors credible but gave greater weight to the testimony of Dr. Atkins because his testimony was "more cogent, plausible and logical . . . regarding defendant's mental state at the time of the offense."  As for Dr. Oropeza's testimony, the court found that his opinion was "primarily based on inferences he drew from defendant's psychological history."  The court primarily relied upon the expert testimony in rendering its verdict.  Thus, the record does not support defendant's contention that the court improperly considered and relied upon defendant's invocation of her Miranda rights in rendering its verdict.

"[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence so as to offend the interests of justice[.]" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (citations omitted).  Here, the prosecutor's comment, when "evaluated in light of the overall strength of the State's case," State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (internal quotations omitted) (citations omitted), does not rise to the level of plain error.  The record does not support the conclusion that a "reasonable doubt has been raised whether [the judge] came to a result that it otherwise might not have reached" but for the

prosecutor's comment.  State v. Singh, 245 N.J. 1, 13 (2021) (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

Trial Court's Factual Findings and Legal Conclusions

We next address defendant's final issue: whether the trial court erred by not making adequate findings regarding defendant's mental states for the charged offenses.  Defendant argues that because of this error in the court's factual findings her convictions must be vacated and the matter remanded for a new trial.

In a bench trial, "[t]he court shall . . . find the facts and state its conclusions of law."  R. 1:7-4; see also Locurto, 157 N.J. at474-75.  "A judge should [] make specific findings of fact regarding the elements of the offense."  State ex rel. L.W., 333 N.J. Super. 492, 498 (App. Div. 2000).  However, "the judge need not articulate detailed, subjective analyses of factors such as demeanor and appearance to support credibility on each and every witness."  Ibid. (citing Locurto, 157 N.J. at 474-75).

Moreover, "[a]ppellate courts should defer to trial courts' credibility findings," Locurto, at 474, and not disturb those factual findings "where 'there is substantial evidence to support [its] implicit finding[s],'" id. at 471 (quoting

Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475 (1988)). Thus, we "review a 'trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard.'" Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 336 (App. Div. 2021) (quoting D'Agostino v. Maldondado, 216 N.J. 168, 182 (2013)).

To begin, the court correctly stated the elements of each offense and the state's burden of proof as to each element beyond a reasonable doubt. For the offenses charged, the State was required to prove beyond a reasonable doubt: (1) as for the charge of murder, that defendant caused D.D.'s death or serious bodily injury purposely or knowingly; (2) as for the charge of unlawful possession of a weapon, that "there was a weapon, that defendant possessed the weapon knowingly and that [] defendant's possession of the weapon was under circumstances not manifestly appropriate for lawful use;" and (3) as for the charge of possession of a weapon for an unlawful purpose, "that there was a weapon, that defendant possessed the weapon with the purpose to use it against the person or property of another, and that defendant's purpose was to use the weapon unlawfully." N.J.S.A. 2C:11-3(a)(1) and (2), :39-4(d), :39-5(d). The court set forth the elements of each offense, including the mental state required to be proven beyond a reasonable doubt.

The court summarized the testimony of the witnesses and assessed their credibility. It also referenced photographic and video evidence pertaining to the scene of the crime and defendant's actions after she left the apartment. These findings supported the court's conclusion given after detailing the evidence presented:

> There's no doubt that the State has proven beyond a reasonable doubt that [defendant] caused [D.D.]'s death and that she did so purposely or knowingly as set forth in count [one] of the [i]ndictment. The record contains ample evidence to support this finding. Moreover[,] this count is not disputed.
>
> The state has also proven beyond a reasonable doubt each element of unlawful possession of a weapon and possession of a weapon for an unlawful purpose. [D.D.] was killed by a knife that only contained the DNA of the decedent as well as defendant [].

A reasonable inference could be drawn from the conclusion that defendant caused D.D.'s death by stabbing her with a knife and that defendant did so purposely or knowingly as the court found. We discern no basis to disturb the court's findings as to the murder charge.

To sustain the possession of a weapon for an unlawful purpose offense, the State was required to prove beyond a reasonable doubt that there was a weapon, defendant possessed it, she possessed it with the purpose to use it against the person or property of another, and that her purpose was to use it

31

unlawfully. N.J.S.A. 2C:39-4(d). The photographic evidence highlighted by the court showed "bloody handprints on the victim's purse as well as a [fifteen]-inch knife in the kitchen sink." The court summarized the testimony of the medical examiner, Dr. Peter Mazari, who explained that D.D. died "from multiple sharp-force injuries and that the manner of death [was] homicide." According to Dr. Mazari, the autopsy revealed D.D. "had [eighty-four] sharp force injuries caused by a blade or other sharp instrument, [forty-seven] cutting wounds and [thirty-seven] stab wounds." The court found the testimony of Dr. Mazari credible.

The evidence clearly showed there was a bloody knife which had both defendant and D.D.'s DNA on it. D.D. died as a result of multiple stab wounds caused by a sharp instrument, such as a knife, and she did not inflict those deadly wounds upon herself. "Circumstantial evidence can suffice to establish an unlawful purpose." State v. Petties, 139 N.J. 310, 318 (1995). These well-grounded facts are sufficient to support an inference that the knife was possessed by defendant for the unlawful purpose of killing her mother.

Likewise, these facts were sufficient to prove that defendant possessed the knife knowingly and under circumstances not manifestly appropriate for lawful use. N.J.S.A. 2C:39-5(d). The credible and substantial evidence in the record

32

supports a reasonable, legitimate inference that defendant possessed the knife knowingly and for the unlawful purpose of killing her mother. "Of course, defendant had no duty to offer an explanation of a lawful purpose" for possession of the knife, Petties, 139 N.J. at 318; yet there is no scintilla of evidence suggesting any lawful purpose or explanation for the bloody knife left in the kitchen sink at the scene of the crime.

The court then focused on the "primary issue"—whether defendant had proven by a preponderance of the evidence that she was insane at the time she committed these offenses. The court explained why it rejected defendant's insanity defense after detailing the testimony of the experts and making credibility findings. Finding Dr. Atkins' opinion more "cogent, plausible and [offering a more] logical assessment of defendant's mental state at the time of the offense," the court placed greater weight and relied upon Dr. Atkins' opinion over that of Dr. Oropeza.

Rule 1:7-4(a) requires trial courts to make sufficient findings of fact and to "correlate them with the relevant legal conclusions." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)). The purpose of this rule is to avoid "[n]aked conclusions." Rutgers Univ. Student Assembly (RUSA) v. Middlesex Cnty. Bd. of Elections, 438 N.J. Super. 93, 107

(App. Div. 2014) (quoting Curtis, 83 N.J. at 569-70). We reject defendant's assertion that the court failed to make adequate factual findings as to her mental states for each offense. Instead, we are satisfied that the court's factual findings and conclusions comply sufficiently with Rule 1:7-4(a)'s requirements.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

34

A-2572-23